IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILE

MAR 10

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IOTA XI CHAPTER OF THE SIGMA CHI    )
FRATERNITY, et al.,                 )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )     No. 1:07cv883 (LMB/TCB)
                                    )
PAMELA PATTERSON, et al.,           )
                                    )
          Defendants.               )

MEMORANDUM OPINION

Plaintiff Iota Xi Chapter of the Sigma Chi Fraternity ("the

Chapter") and two of its members, Ryan Duckwitz and Justin

Pietro, filed this action under 42 U.S.C. § 1983, alleging that

officials at George Mason University ("the University") violated

their rights to free speech, free association, due process, and

equal protection when the University suspended official

recognition of the Chapter.  Asserting that the University's

disciplinary process was fraught with constitutional error,

plaintiffs sued five university administrators in their

individual and official capacities based on their roles in

disciplining the Chapter.[1]

Both parties have filed cross motions for summary judgment.

For the reasons stated in open court and in this memorandum

opinion, plaintiffs' Motion for Summary Judgment will be denied

---

[1] Unless otherwise noted, the Court will refer to plaintiffs
collectively as "the Chapter" and to the university officials
collectively as "the University."

and defendants' Motion for Summary Judgment will be granted.

<u>Background</u>

The Iota Xi Chapter of the Sigma Chi Fraternity was, until May 8, 2006, an officially recognized student group at George Mason University.[2]  Plaintiffs Ryan Duckwitz and Justin Pietro are members of the Chapter.  During the time period relevant to this litigation, defendant Michelle Guobadia was the Assistant Director for Student Activities, defendant Pamela Patterson was the Associate Dean of Students, defendant Girard Mulherin was the Dean of Students, defendant Sandy Hubler was the Vice President of University Life, and defendant Alan Merten was the President of the University.

On February 25, 2005, the Chapter co-hosted a party with the Alpha Omicron Pi sorority at an off-campus house.  A female sorority member alleged that a Sigma Chi member sexually assaulted her in the house that night after the party.  <u>See</u> Patterson Decl. ¶ 8.  The woman later brought administrative charges against the member, and, on September 14, 2005, the University's Sexual Assault Hearing panel adjudicated him responsible for the charges.[3]  <u>Id</u>. ¶ 14.  The member was

---

[2] Official recognition allows a student group to publish their affiliation with the University, apply for certain university funds, and seek assistance from the University in planning events.  <u>See</u> Mulherin Dep. 63-65.

[3] The Sexual Assault Hearing Panel is group of university administrators that adjudicates sexual assault complaints.  <u>See</u>

immediately dismissed from the University. <u>See</u> Def. Exhibit 10.

In mid-August 2005, the University learned that several Chapter members were involved in a "caserace party" where many underage guests engaged in excessive drinking and then vomited into trash canisters. <u>See</u> Guobadia Decl. ¶16; Mulherin Decl. ¶ 17. Pictures and videos from the party were later posted on the internet. <u>Id</u>. As a result, Mulherin placed the Chapter on interim suspension on August 24, 2005. <u>Id</u>.; <u>see</u> <u>also</u> Def. Exhibit 12. He lifted the suspension on September 6, 2005 after determining that the party was "an unauthorized action by a person who happened to be a fraternity member" and that the leadership of the Chapter fully cooperated with the University's investigation. Mulherin Dep. 16; <u>see</u> <u>also</u> Def. Exhibit 13.

On September 7, 2005, the Chapter hosted a second party where alcohol was again served to underage guests. Another female student filed an administrative complaint, alleging that the (now former) vice president of the Chapter sexually assaulted her during the party. <u>See</u> Patterson Decl. ¶ 17. The Sexual Assault Panel adjudicated the member responsible for the assault on September 14, 2005, <u>id</u>. ¶ 21, and the University placed him on disciplinary probation for the rest of his university career.[4]

---

Mulherin Decl. ¶ 9.

[4] The terms of the probation required the individual to disassociate from the Chapter and avoid contact with the accusing party.

-3-

See Def. Exhibit 15.

At 8:30 a.m. on December 7, 2005, several members and pledges of the Chapter gathered on-campus near the Fenwick library, and some began to sing and march. See Guobadia Decl. ¶ 18. Guobadia witnessed the event from her office and concluded that the Chapter was conducting a hazing activity. Id. ¶ 21. Later that day, an assistant dean reported that a Sigma Chi pledge claimed he could not, consistent with the Chapter's rules, return to his residence to collect an extra credit assignment for class. Id. ¶ 22; see also Plt. Exhibit K. In response, Guobadia placed the Chapter on "interim suspension," thereby prohibiting it from participating in all social events, community service, and recruitment efforts. See Plt. Exhibit G.

A member of the Chapter protested the decision directly to Guobadia, asserting that the singing activity was voluntary and not a condition of membership. See Plt. Exhibit I. The member also insisted that the Chapter did not prohibit pledges from returning to their residences. Id.

On December 8, 2005, Guobadia sent a memorandum to Patterson, characterizing the two events as hazing. See Plt. Exhibit J. That same day, Patterson sent a second suspension notice to the Chapter, alleging that it had engaged in hazing and

-4-

underage drinking in violation of various university policies.[5]
See Plt. Exhibit L.  She further restricted the Chapter from
engaging in any social activity where more than three members or
pledges were present.  Id.  Patterson based this decision on what
she described as a "pattern of behavior" by the Chapter.
Patterson Dep. 50.

The Chapter requested that the University detail the nature
of the charges.  On February 23, 2006, the University presented
the following list: "Underage drinking", "Providing alcohol to
minors", "Hazing", and "Sexual assault/s."  Def. Exhibit 18.  In
response to further inquiries, on March 27, 2006, the University
produced an expanded description of the four charges:

> 1. Hazing – 8:30 a.m. on December 7, 2005 in the area
> of Fenwick Library on the George Mason Campus.
> 2. Providing alcohol to minors – September 7, 2005.
> 3. Underage consumption of alcohol – September 7, 2005.
> 4. Sponsoring a party under conditions that resulted in
> sexual assault/s on a female guest.  February 26, 2005
> and September 7, 2005[.]

Def. Exhibit 19.  Charges two, three, and four implicated the two
off-campus parties discussed above.  Based on evidence presented
to the Sexual Assault Hearing Panels, the University had
concluded that the events were fraternity-related given the
identity of the occupants of the house and the attendees, and
further determined that the two underage female victims had been

---

[5] The University described the notice as a "form letter that
the Dean of Students uses in placing fraternities and sororities
on interim suspension."  Patterson Decl. ¶ 23.

-5-

served alcohol at those events.[6]  See Patterson Decl. ¶¶ 13, 20; Mulherin Decl. ¶ 19; see also Patterson Dep. 63.

On March 10, 2006, Mulherin offered to resolve the outstanding charges with a two-year suspension.  See Mulherin Decl. ¶ 23.  The Chapter declined based on its belief that the University had violated certain procedural protections.  See Benedetto Decl. ¶ 22.

On May 4, 2006, the University convened a panel of the Student Judicial Board to address the allegations against the Chapter.[7]  After a five-hour hearing, the panel found the Chapter responsible for hazing based on the testimony of Guobadia and Patterson, and it found the Chapter responsible for "providing alcohol to minors" and "sponsoring a party under conditions that led to sexual assault/s" based on the evidence presented during the hearing as well as on facts found in the earlier disciplinary hearings.  The Board recommended that the Chapter be suspended for 10 years, that current members of the Chapter be prohibited from associating with any fraternal organization recognized by the University, and that the University publish the fact that it was withdrawing recognition of the Chapter.  See Def. Exhibit 21.

---

[6] The Chapter did not participate in those earlier disciplinary proceedings.

[7] The Student Judicial Board is comprised of three to five students.  See Mulherin Decl. ¶ 14.  The University's designee and the accused are each permitted to make an opening and closing statement and present evidence.  Id. ¶ 15.

Patterson adopted those recommendations.  See Def. Exhibit 22.

The Chapter appealed the panel's decision to Sandy Hubler, the Vice President of University Life.  See Plt. Exhibit U.  In a one-page letter dated June 2, 2006, Hubler upheld the decision, concluding that the Chapter "failed to provide new evidence, identify a defect in the proceedings, or specify a standard of fairness that was abridged."  Plt. Exhibit V.

In August 2006, the Director of Judicial Affairs, David Shaw, brought new charges against six Chapter members for failing to comply with a university official, unauthorized use of the University logo and name, and failure to comply with an official judicial sanction.  See Plt. Exhibit Y.  After a series of administrative hearings, Shaw adjudicated each member responsible for at least one of the charges.  The specific charges against plaintiff Pietro were initiated by Guobadia after she observed him attending an orientation carnival while wearing his Sigma Chi letters.  See Shaw Dep. 15.  The other charges were initiated after members of the Chapter announced plans to host an off-campus golf tournament and a Brotherhood Day.  See Pietro Decl. ¶ 6.  Shaw placed the six members on a one-year probationary status, thereby prohibiting them from participating in any university-sponsored extracurricular activities.[8]

_____

[8] In its memorandum, the Chapter complains about other actions taken by the University after August 31, 2007 – the date the complaint was filed.  However, the Chapter never filed an

On August 31, 2007, the Chapter, Duckwitz, and Pietro filed
the present action under 42 U.S.C. § 1983, alleging violations of
due process, free speech, free association, equal protection,
breach of contract, conspiracy, and supervisory liability.   They
requested monetary and injunctive relief.

On September 14, 2007, the plaintiffs' motion for a
preliminary injunction was denied, and on November 9, 2007, the
University was dismissed as a defendant and the breach of
contract claim was dismissed from the complaint.   Both parties
have filed cross motions for summary judgment.

### Standard of Review

Summary judgment is appropriate if there is no genuine issue
as to any material fact and the moving party is entitled to
judgment as a matter of law.   Fed. R. Civ. P. 56(c); Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1985).   In ruling on a
motion for summary judgment, a court should accept the evidence
of the nonmovant, and all justifiable inferences must be drawn in
his favor.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986).

### Discussion

Three substantive counts remain in this litigation: Count I

---

amended complaint and, therefore, never added these new
allegations and claims.   For this reason, these matters are not
before the Court and will not be addressed in this memorandum
opinion.

(Due Process); Count III (First Amendment); Count IV (Equal Protection).

I.   Due Process

The Chapter first alleges violations of its right to procedural due process.[9]  To succeed on this claim, "a litigant must show that it was deprived of a protected interest without due process of law."  Palmer v. City Nat'l Bank of W. Va., 498 F.3d 236, 248 (4th Cir. 2007).  This inquiry proceeds in several stages.  First, the Chapter must identify a cognizable protected interest.  Second, the Chapter must demonstrate that the University has deprived it of that interest.  Third, the Chapter must show that the procedures employed by the University to deprive it of that interest were constitutionally inadequate.

A.   Cognizable Liberty Interest

A cognizable liberty interest "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest

---

[9] In its complaint, the Chapter also alleges a violation of substantive due process because "[d]efendants . . . prohibit[ed] Sigma Chi from exercising its liberty interest in free association."  Compl. ¶ 72.  This claim fully overlaps with the Chapter's invocation of the right to free association under the First Amendment.  Accordingly, the Chapter's substantive due process claim is not cognizable.  See Presley v. City of Charlottesville, 464 F.3d 480, 491 (4th Cir. 2006) ("[S]ubstantive due process cannot independently support a claim when an explicit textual source of constitutional protection governs the precise conduct at issue.") (internal quotation and citation omitted).

-9-

created by state laws or policies." <u>Wilkinson v. Austin</u>, 545
U.S. 209, 221 (2005) (internal citations omitted). The state law
inquiry is fairly straightforward. The record contains no
indication of any official policies, guidelines, laws, or state
regulations that require the University to recognize student
organizations. <u>See</u> Mulherin Decl. ¶ 10. Rather, it appears that
official recognition – eligibility, criteria, required forms,
etc. – is committed entirely to the discretion of the
University's Office of Student Activities.

The constitutional inquiry is more complex. The Chapter
invokes its protected liberty interest in the expressive
associational rights of its members. Under the First Amendment,
the State may not "impose liability on an individual solely
because of his association with another." <u>NAACP v. Claiborne
Hardware Co.</u>, 458 U.S. 886, 918-19 (1982). This right "is an
inseparable aspect of the 'liberty' assured by the Due Process
Clause." <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S.
208, 214 (1986) (citation omitted).

The University opposes this argument on the ground that
fraternities are purely social in nature and, therefore, fall
outside the protection of the freedom to associate. The Supreme
Court has recently addressed and rejected this position. In <u>Boy
Scouts of Am. v. Dale</u>, 530 U.S. 640 (2000), the Court held that
"a group must engage in some form of expression, whether it be

public or private," to come within the ambit of the First
Amendment's protection of expressive association. <u>Id</u>. at 648.
It then concluded that the Boy Scout's stated mission – "to
instill values in young people" – constituted expressive
association. <u>Id</u>. at 650 ("It seems indisputable that an
association that seeks to transmit such a system of values
engages in expressive activity.").

To that end, a college fraternity is no different from the
Boy Scouts. The Chapter has adequately described its
institutional mission to inculcate its members with certain
leadership skills and community values and, as a result, it is
protected by the First Amendment's expressive associational
right. <u>See</u> Benedetto Decl. ¶¶ 6-7. Accordingly, the Chapter has
adequately alleged a protected liberty interest.[10]

    B.   Deprivation of Interest

The Chapter must next show a deprivation of the right of its
members to freely associate. In this vein, the University argues
that its withdrawal of official recognition did not in anyway
harm the right of Chapter members to associate with each other.

The University's position is correct. The withdrawal of
recognition did not in and of itself deprive Chapter members of
their First Amendment rights. Nothing in the University's

_____

[10] Based on this conclusion, the Court need not address the
merits of the Chapter's argument that it has a protected liberty
interest in its reputation.

sanction prevents the Chapter from continuing to exist.  It may recruit current George Mason students as members, schedule meetings, and host social events.[11]  The withdrawal of official recognition simply removes the imprimatur of the University from the Chapter's activities and denies the Chapter use of the University's name, resources, and property.  Although the Chapter may become a less attractive organization as a result of losing official recognition, the University's action does not deprive Chapter members of their constitutional right to associate with each other.

The University imposed other sanctions on the Chapter's members.  Notably, the Student Judicial Board recommended, and the University adopted, "[a] prohibition preventing current members of Sigma Chi from belonging to any fraternal organization recognized by the University."  Def. Exhibit 21; see also Def. Exhibit 22 ("The Dean of Students and the Director of Student Activities are asked to monitor membership in George Mason University recognized fraternal organizations to insure that the current membership of Sigma Chi fraternity does not re-emerge under another name.").  Members violating this restriction are subject to further disciplinary action.  Id.

A Chapter member is therefore prohibited from joining any

---

[11] Indeed, the Chapter still recruits members, holds regular meetings, and hosts parties.  See Duckwitz Dep. 54-55; Pietro Dep. 87.

-12-

recognized fraternal organization on the George Mason campus, even if that organization would welcome his membership. This restriction constitutes a deprivation of the Chapter members' right to expressive association. Cf. United States v. Hammoud, 381 F.3d 316, 329 (4th Cir. 2004) (asking whether the restriction in question "prohibit[s] mere association" with an organization). For this sanction to pass constitutional muster, the University must satisfy the minimum requirements of due process.

C.   Due Process Afforded

The final matter before the Court is whether, in light of the interests at stake, the University afforded the Chapter sufficient process before imposing the disciplinary sanctions at issue.  To demonstrate that it was not afforded adequate process, the Chapter alleges numerous deviations from, or noncompliance with, the procedural protections listed in the University's Judicial System for Student Conduct ("JSSC") (June 24, 2004).[12]

The Chapter's reliance on the procedural guarantees in the JSSC is entirely misplaced because a university's failure to respect its own procedural protections is not a fortiori a

---

[12] For instance, the Chapter alleges that it was denied prompt notice of charges, the right to a decision based on clear and convincing evidence, the right to have a case processed without prejudicial delay, and the right to an appeal.  See JSSC § V.  It is not clear that the JSSC grants such rights to the Chapter.  The JSSC's procedural standards are only "guaranteed to a student in any university disciplinary proceeding."  Id. (emphasis added).  This language plainly excludes organizational entities.

violation of due process.  See Flaim v. Med. Coll. of Ohio, 418
F.3d 629, 640 (6th Cir. 2005); Trotter v. Regents of the Univ. of
N.M., 219 F.3d 1179, 1185 (10th Cir. 2000); Schuler v. University
of Minn., 788 F.2d 510, 515 (8th Cir. 1986); Hill v. Trustees of
Ind. Univ., 537 F.2d 248, 252 (7th Cir. 1976).[13]  The only
question before the Court is whether, from a constitutional
standpoint, the Chapter received adequate process.

The Fourth Circuit has provided clear guidance on this
issue.  In the university disciplinary setting, due process
requires "only that [students] be afforded a meaningful hearing."
Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 630
(4th Cir. 2002).  A "meaningful hearing" requires notice and a
meaningful opportunity to be heard.  Id.  As a corollary to these
requirements, the disciplinary panel's decision cannot be
arbitrary; rather, the panel must base its decision on some
evidence in the record.  Cf. Baker v. Lyles, 904 F.2d 925, 931-32
(4th Cir. 1990) (summarizing due process standards in the prison
context).

1.    Notice

---

[13] In some cases, "significant departures from stated
procedures of government" may constitute a violation of
procedural due process.  Jones v. Bd. of Governors of Univ. of
N.C., 704 F.2d 713, 717 (4th Cir. 1983).  Assuming arguendo that
the Chapter was entitled to the procedural protections in the
JSSC and that the University departed from those protections, the
departures were not "sufficiently unfair and prejudicial" as to
give rise to a procedural due process claim.  Id.

The Chapter attacks the adequacy of the University's notice of disciplinary charges by arguing that the most serious charge – "sponsoring a party under conditions that led to sexual assault/s of a female guest" – was not lodged until one year after the alleged conduct in one instance, and nearly seven months in the other. However, the Chapter fails to detail how these delays prejudiced the preparation of its defense.

The Chapter also attacks the vagueness of the charge, which did not identify or explain the "conditions" that led to the sexual assaults or how the chapter was responsible for those assaults. Although the charge may not be a model of clarity, a reasonable person, upon reading the entire list of charges, would understand the nature of the University's allegations – that the Chapter irresponsibly hosted social events where alcohol was served to underage guests, whose inebriation contributed to the later sexual assaults. See Richardson v. Town of Eastover, 922 F.2d 1152, 1160 (4th Cir. 1991) ("[D]ue process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action . . . .") (internal quotations and citation omitted). An examination of the hearing transcript demonstrates that the Chapter adequately understood the nature of these charges.

Lastly, the Chapter complains that Patterson and Mulherin failed to provide the Chapter notice of "secret charges" –

-15-

allegations about the caserace party and other purported misconduct by the Chapter. However, there is no evidence in the record that the adjudicators – the three members of the Student Judicial Board – were aware of or based their decision on events not listed in the notice of charges. The evidence presented at the hearing was also constrained to those four charges.

The University's notice was deficient in one respect; it listed the Fenwick Library incident as the only hazing charge, omitting the second alleged hazing incident involving the pledge who was prevented from returning to his residence to collect an assignment. See Def. Exhibit 19. Accordingly, the Chapter did not receive adequate notice of the second alleged hazing activity. Outside of that one deficiency, the University's notice of charges was constitutionally adequate.

      2.   Meaningful Hearing

The Chapter asserts a number of procedural irregularities with the University's hearing process, most of which lack constitutional significance.[14]

---

[14] The Chapter complains that Patterson inadequately investigated the reports of hazing, that Patterson's charging decision was overly harsh and animated by an improper motive, that the Student Judicial Board failed to use a "clear and convincing" standard, that the hearing was closed to the public, and that Vice President Hubler failed to conduct an impartial appellate review of the Board's decision. The Chapter does not offer, nor can the Court locate, any authority supporting its position that students at an educational institutional are entitled to a neutral charging official, a particular standard of evidence, an open hearing, or appellate review.

-16-

The transcript of the disciplinary hearing demonstrates that the Student Judicial Board allowed the Chapter to make an opening and closing statement, present witnesses and evidence, and conduct limited cross examinations of the University's witnesses. In the Fourth Circuit, these procedures are generally sufficient to satisfy due process in a school disciplinary setting. See Tigrett, 290 F.3d at 630.

The Chapter raises one colorable challenge to the adequacy of the hearing. At the request of the University, the Student Judicial Board accepted the fact of the two earlier sexual assaults, thereby preventing the Chapter from offering evidence that would disprove or cast doubt on the occurrence of those assaults. The Chapter contends that this restriction deprived it of its right to a meaningful hearing.

The Supreme Court, in Mathews v. Eldridge, 424 U.S. 319 (1976), identified three factors in determining the constitutional adequacy of a particular hearing:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335. The Court concludes that the three Mathews factors substantiate the Student Judicial Board's decision to prohibit

-17-

the Chapter from relitigating the fact that the sexual assaults had occurred.  First, the private interest at stake is less serious than in traditional due process challenges.  Chapter members did not face expulsion or suspension, nor were they subjected to a significant fine or financial burden as a result of the University's sanctions.  Rather, members simply faced a restriction on their ability to participate in on-campus extracurricular activities.

Second, the risk of an erroneous deprivation is fairly minimal.  The Student Judicial Board accepted the fact of the sexual assaults based on the results of two prior disciplinary hearings.  In both cases, the accused students – a member of the Chapter and the vice president of the Chapter – appeared before the hearing panel with legal counsel.  They were allowed to call fellow Chapter members as witnesses and present evidence to support their positions.  Ultimately, the panel found the students responsible for the assaults.  Neither individual appealed the determination, nor sought relief in federal court.  Those two individuals had the greatest incentive to disprove the occurrence of the assaults and failed to do so.  Based on these undisputed facts, the Student Judicial Board could reasonably conclude that those earlier proceedings bore particular indicia of reliability.  It is also significant that the Chapter was not denied the right to present evidence that would have distanced

-18-

the organization from the assaults - i.e., that the Chapter did not serve alcohol to the underage female victims, that it verified the ages of party attendees, and that it offered adequate supervision of attendees.

Third, the University has a substantial interest in protecting the details of the sexual assaults so as to avoid undue embarrassment and public exposure of the victims.  Allowing the Chapter to rebut the existence of the assaults at the hearing would have required a full-scale relitigation of those incidents. Such relitigation would have obscured the greater issue of the Chapter's responsibility for serving alcohol to underage guests, imposed additional costs and burdens on the University, and, most importantly, forced the two female victims to again testify in detail as to the nature and circumstances of the sexual assaults.[15]

Applying the three Mathews factors, the Court finds that the Student Judicial Board's decision to accept the fact of the two sexual assaults as conclusively established did not deprive the Chapter of its right to due process.

Finally, although the Student Judicial Board did constrain some of the Chapter's questioning of the witnesses and its

---

[15]   The two female victims testified at the Chapter's disciplinary hearing as to the fact of the assaults, but did not offer specific details about the incidents.  See Def. Exhibit 14, part 2, at 13, 37.

-19-

arguments, many of those limits were imposed in response to the belligerent conduct of the Chapter's representative.   The transcript reveals that the Chapter's representative was obstinate and combative throughout the hearing, refusing to follow the instructions of the Board or focus his presentation on the charges at issue.   To the extent that the Chapter now complains that its defense was unduly prejudiced by these constraints, it can only blame itself.

### 3.   Reasonable Decision

Finally, the Student Judicial Board's decision must be supported by some evidence in the record.   Although the University's hazing determination was arbitrary and without evidentiary support,[16] the University had an adequate and independent justification for its disciplinary action. Specifically, there was extensive, reliable evidence that underage George Mason students, including the two female victims, were served alcohol at two separate Chapter-sponsored parties and

---

[16] The University presented no evidence that the Fenwick Library incident on December 7, 2005 was hazing.   The University's sole witness, Michelle Guobadia, could not even make out the students' words.   See Guobadia Decl. ¶ 18.   Rather, the University relied entirely on the conformity of the participants' dress, gait, and chant to substantiate its charge.   Nothing in the record suggests that the event was abusive, embarrassing, or harmful to those involved.   Indeed, many collegiate activities – marching band and ROTC drills – share the same characteristics. Furthermore, in this litigation, the University has repeatedly characterized the event as "spontaneous singing and dancing," which suggests an absence of any coercion.   See, e.g., Def. Mem. in Support [76], at 23.

that some students experienced severe intoxication.[17]

Furthermore, as discussed above, the Student Judicial Board took notice of the earlier disciplinary findings that two sexual assaults occurred in the vicinity of these parties. This record established an evidentiary basis upon which the Student Judicial Board could reasonably conclude that the events and atmosphere of the Chapter-sponsored parties were contributing factors to the sexual assaults.[18]

Moreover, it was entirely reasonable for the University to classify these events as antithetical to its educational mission and the safety of its students. On this record, the decision to hold the Chapter accountable for its members' misconduct during the two off-campus parties was hardly arbitrary. Accordingly, summary judgment in favor of the University on the due process claim is appropriate.

II.  First Amendment

The Chapter contends that the University impermissibly punished and retaliated against its members for engaging in

---

[17] See, e.g., Def. Exhibit 8 (Statement of J. Arico) ("By 11:00pm that night, [redacted] was so drunk that she was in the bathroom throwing up. . . . We were worried that [redacted] would fall and break her neck or would pass out down there and choke on her own vomit.").

[18] For instance, the Board heard evidence that party attendees distracted the boyfriend of one female victim while the sexual assault was occurring.  See Def. Exhibit 14, part 2, at 49-50.

protected expression, specifically for singing and dancing in front of Fenwick Library, objecting to the University's disciplinary process, and displaying Sigma Chi letters on their clothing.

A.   Singing and Dancing Near Fenwick Library

The Chapter asserts that the University could not, consistent with the First Amendment, discipline it for the Fenwick Library incident, where participants engaged in spontaneous singing and dancing.  The Court agrees that this activity is protected under the First Amendment,[19] but concludes that the Chapter lacks Article III standing to pursue this claim.

To have standing to bring a lawsuit, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751 (1984).  With respect to the redressability prong, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000).

Even if the Chapter were to prevail on the merits of its

---

[19] The undisputed evidence shows that the participants were collectively singing, see Pietro Dep. 67; Plt. Exhibit F, which is sufficient to undergird a free expression claim.  See Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989).  Furthermore, the University's observation that the activity was not performed for an audience is without significance.  The First Amendment extends to intra-organization discussion, debate, or song.

First Amendment claim, it would not be entitled to any relief, monetary or injunctive.  As discussed above, the University's sanctions are fully supported by an adequate and independent justification - the determination that the Chapter irresponsibly hosted two off-campus parties.  The disciplinary process for those charges was initiated on December 8, 2005, within a day of the Fenwick Library incident.

B.    Retaliation for Opposing Disciplinary Process

The Chapter next argues that the University unlawfully retaliated against it for challenging alleged procedural deficiencies in the disciplinary process.  After the Chapter declined Mulherin's offer of a two-year suspension, the University pursued a far more severe sanction - withdrawal of official recognition and a 10-year ban - against the Chapter.

This claim is without merit.  The University is entitled to impose any sanction permitted by its own rules and regulations. As part of its discretion to select the appropriate sanction, the University may offer a compromise plea bargain to the accused in hopes of reaching a timely and amicable settlement of the charges, sparing the expense of a hearing, and, as this case demonstrates, avoiding time-consuming litigation in federal court.   If the accused rejects the offer, the University is not

-23-

foreclosed from seeking a more severe penalty.[20]

C.   Wearing Sigma Chi Letters

The Chapter alleges that the University infringed on two Chapter members' right to free expression by punishing them for wearing their Sigma Chi letters into a public university building.   The claim cannot be prosecuted in this litigation because the proper party has not been named as a defendant. David Shaw, the director of judicial affairs, administratively adjudicated the charges related to the members' display of Sigma Chi letters and imposed the allegedly unconstitutional sanction. He was not named in the Chapter's complaint.   Cf. Moore v. Pemberton, 110 F.3d 22, 23 (7th Cir. 1997) (per curiam) ("[T]he right defendants in a § 1983 suit are the persons whose wrongful acts harmed the plaintiff.").

Accordingly, summary judgment will be granted to the University on the Chapter's First Amendment claim.

III. Equal Protection

The remaining equal protection claim must be dismissed because the Chapter failed to explain how it was treated

---

[20] In the criminal context, a prosecutor is free to indict a defendant on more serious charges if the defendant insists on his right to a jury trial.   See United States v. Hill, 2004 WL 691509, at *4 (4th Cir. Apr. 2, 2004) (unpublished) ("[T]he prosecutors indicted defendants on more serious charges after the defendants rejected plea bargains. . . . [N]o presumption of vindictiveness arose because in the 'give-and-take' of plea bargaining, there is no retaliation so long as the defendant remains free to accept or reject the plea.") (citation omitted).

differently than other similarly situated organizations.

IV.   Remaining Counts

Having found no underlying constitutional violations, the Court will grant summary judgment to the University on Count V (Supervisory Liability) and Count VI (Conspiracy).

<u>Conclusion</u>

For the reasons stated in open court as supplemented in this memorandum opinion, plaintiffs' Motion for Summary Judgment will be denied and the defendants' Motion for Summary Judgment will be granted.

A separate order consistent with this opinion will be entered.

Entered this _10_ day of March, 2008.

_____/s/_____

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia